## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EVAN TOBIAS, Derivatively on behalf of INTEL CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>CRAIG R. BARRETT, PAUL S. OTELLINI, CHARLENE BARSHEFSKY, CAROL BARTZ, SUSAN L. DECKER, D. JAMES GUZY, REED E. HUNDT, JAMES D. PLUMMER, DAVID S. POTTRUCK, JANE E. SHAW, JOHN L. THORNTON, and DAVID B. YOFFIE,<br><br>Defendants,<br><br>vs.<br><br>INTEL CORPORATION, a Delaware Corporation,<br><br>Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO.<br>)<br>)<br>)<br>)<br>)<br>) JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, derivatively on behalf of Intel Corporation ("Intel" or the "Company"), alleges for his Verified Shareholder Derivative Complaint, based upon, inter alia, the investigation made by and through his attorneys, including the review of the complaints and decisions in litigation, as follows:

### SUMMARY OF ACTION

1.    This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant Intel against its Board of Directors and senior officers for their breaches of fiduciary duties of good faith, loyalty and care, and gross mismanagement.

2.      As a direct result of defendants' actions, the Company has engaged in monopolistic conduct in the microprocessor market by threatening, coercing, and bribing customers to refrain from dealing with Intel's major competitor, Advanced Micro Devices, Inc. ("AMD"), or with any other actual or potential competitors.  Although the Company's management and its Board of Directors have been on notice of the violations of law for over 15 years, these defendants authorized and/or approved such conduct, or recklessly allowed it to continue unabated to the detriment of the Company and its shareholders.

3.      The defendants' actions culminated in numerous prosecutions based on improper exercise of monopoly powers filed by the European Commission, the South Korean Fair Trade Commission, Japan's Fair Trade Commission ("JFTC"), and by the New York State Attorney General, as well as a number of civil suits in the United States, including *In re Intel Corp. Microprocessor Antitrust Litigation*, Civil Action No. 05-485-JJF, pending in the United States District Court for the District of Delaware (the "AMD Action"), and Japan.  These charges and investigations have already cost Intel millions of dollars in damages, and will likely result in additional legal fees and expenses, disgorgement of profits illegally retained by the Company, additional costs associated with responding to lawsuits and investigations, and  irreparable harm to the Company's reputation.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States.  This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, Intel is incorporated in Delaware.

## THE PARTIES

6.    Plaintiff Evan Tobias, a resident of the state of New York, has owned shares of Intel at all times relevant herein.

7.    Intel is a corporation duly organized and existing under the laws of the State of Delaware and maintains its headquarters at 2200 Mission College Boulevard, Santa Clara, California 95054-1549. The stock of Intel is publicly traded on NASDAQ under the symbol "INTC."

8.    Defendant Craig R. Barrett ("Barrett"), a resident of California, has served as Chairman of the Board of Directors  (the "Board") of Intel since 2005.  He has been a director of the Company since 1992.  Barrett serves on the Executive Committee of the Company's Board. Previously, Barrett served as the Company's COO, from 1993 until 1997, and as its CEO from 1998 until 2005.

9.    Defendant Paul S. Otellini ("Otellini"), a resident of California, is President and Chief Executive Officer of the Company.  He has been a director of the Company since 2002.

10.    Defendant Charlene Barshefsky ("Barshefsky"), a resident of Washington, DC, has served as a director of Intel since 2004.  Barshefsky serves on the Corporate Governance and Nominating Committee of the Board.  Barshefsky currently serves as a director of the American Express Company, the Estee Lauder Companies, Inc. and Starwood Hotels & Resorts Worldwide, Inc.  She is also a member of the Board of Directors of the Council on Foreign Relations.

11.    Defendant Carol Bartz ("Bartz"), a resident of California, has served as a director of Intel since January 16, 2008. Bartz has served as Executive Chairman of the Board, Chief Executive Officer and President of Autodesk, Inc. She is also a director of Cisco Systems, Inc. and Network Appliance, Inc.

12.    Defendant Susan L. Decker ("Decker"), a resident of California, has served as a director of Intel since 2006. Since 2000, Decker has been Executive Vice President, Finance and Administration and Chief Financial Officer of Yahoo!, Inc. She currently serves as a director of Costco Wholesale Corporation.

13.    Defendant D. James Guzy ("Guzy"), a resident of California, has served as a director of Intel since 1969. Guzy serves on the Audit Committee and is Chairman of the Finance Committee of the Board. He is Chairman of the Board of PLX Technology, Inc. and a director of Cirrus Logic, Inc. He also holds directorships within the AllianceBernstein and Davis Funds.

14.    Defendant Reed E. Hundt ("Hundt"), a resident of Maryland, has served as a director of Intel since 2001. Hundt serves on the Corporate Governance and Nominating Committee and is Chairman of the Compensation Committee of the Board. Since 1998, he has been a principal of Charles Ross Partners, LLC.

15.    Defendant James D. Plummer ("Plummer"), a resident of California, has served as a director of Intel since 2005. Plummer serves on the Audit and Finance Committees of the Board. He is also a director of International Rectifier Corporation and Leadis Technology, Inc.

16.    Defendant David S. Pottruck ("Pottruck"), a resident of California, has served as a director of Intel since 1998. Pottruck serves on the Audit, Compensation and Finance Committees of the Board and acts as Chair of the Retirement Plans Investment Policy Committee

of the Board. He is Chairman and Chief Executive Officer of Red Eagle Ventures, Inc. and is Chairman of Eos Airlines.

17.    Defendant Jane E. Shaw ("Shaw"), a resident of California, has served as a director of Intel since 1993. Shaw serves on the Finance Committee and is Chairman of the Audit Committee of the Board. She is also a director of McKesson Corporation.

18.    Defendant John L. Thornton ("Thornton"), a resident of the People's Republic of China, has served as a director of Intel since 2003. Thornton serves on the Compensation and Corporate Governance and Nominating Committees of the Board. He is also a director of the Ford Motor Company, News Corporation and the Pacific Century Group Inc.

19.    Defendant David B. Yoffie ("Yoffie"), a resident of Massachusetts, has served as a director of Intel since 1989. Thornton serves on the Compensation Committee and acts as Chairman of both the Corporate Governance and Nominating and Executive Committees of the Board. He is also a director of the National Bureau of Economic Research.

20.    (a)    The defendants, by reason of their status as officers and executives or members of the Intel Board, have and had the power and influence and did in fact control and influence and cause Intel to engage in the unlawful acts and conduct complained of herein. Each of the defendants is liable as a direct participant in, and aider and abetter of, the wrongs complained of herein.

(b)    By reason of their positions and because of their ability to control the business and corporate affairs of Intel at all relevant times, the defendants owe and have owed Intel and its shareholders the highest fiduciary obligations of fidelity, trust, loyalty, and due care, and were and are: required to use their utmost ability to control and manage Intel in a fair, just, and equitable manner; act in furtherance of the best interests of Intel and its shareholders so as to

benefit all shareholders and not in furtherance of their personal interest or to benefit themselves; and act with complete candor toward the public shareholders. In addition, each director of Intel owes and has owed to Intel and its shareholders the fiduciary duties to exercise due care and diligence in the administration of the affairs of Intel.

21.    The defendants, because of their positions of control and authority as executive officers and/or directors of Intel, were able to and did, directly and indirectly, control the matters and transactions complained of herein. These defendants have and have had the duty to exercise reasonable control and supervision over the officers, employees, agents, business and operations of the Company; to be and remain informed as to how the Company was operating and, upon receiving notice or information of an imprudent, questionable or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and to conduct the affairs of the Company to strictly comply with all applicable laws, rules and regulations, provide the highest quality services, and maximize the profitability of the Company for the benefit of its shareholders.

## SUBSTANTIVE ALLEGATIONS

**A.    Background Facts**

22.    The computer's microprocessor (or chip) is the single component which controls virtually every computational function of the computer. Every computer contains a chip, an integrated circuit capable of executing a menu of instructions and performing requested computations at very high speed. The chip is defined by its instruction set – the repertoire of machine language instructions that a computer follows. When first developed, microprocessors were capable of handling 4 bits and later 8 bits of data simultaneously, subsequently evolving to

16-bit capability, 32-bit capability (allowing the use of advanced graphical interfaces), and presently to 64-bit capability.

23.    When IBM defined the original personal computer ("PC") standards in the early 1980's, it had available to it a variety of microprocessors, each with its own instruction set. Among these were chips developed by Motorola,  National Semiconductor, Zilog, Intel and AMD.  IBM opted for the Intel chip, which utilized what became known as the x86 instruction set ("x86") (after Intel's naming convention for its processors, *i.e.* 8086, 80186, 80286,80386), and a compatible operating system offered by Microsoft, known as DOS.

24.    The x86 versions of Windows and Linux operating systems that are the most commonly used operating systems for both business and personal computer use throughout the world today, have resulted in creation of a myriad of applications and programs that can only run on the x86 instruction set.

25.    While IBM ultimately chose Intel's microprocessor for its PC, IBM demanded that Intel license its product to another entity, AMD, so as not to be limited to a single source of x86 microprocessors.  AMD agreed to abandon its own, competing architecture, and undertook to manufacture x86 chips as a second source of supply.  In 1982, Intel and AMD executed the AMD-Intel Technology Exchange Agreement (the "Agreement") setting forth the terms of the companies' collaboration on x86 instruction set chip manufacturing.

26.    Immediately following the execution of the Agreement, however, Intel embarked on a deliberate campaign to effectively eliminate or negate AMD's effectiveness as a competitor.  By at least 1987, defendants caused Intel to implement a secret scheme, which included providing AMD with incomplete and unusable information, and delayed AMD's ability to reverse engineer or manufacture competitive products.

7

27.    In 1987, AMD petitioned to compel arbitration for Intel's breach of the Agreement. In 1992, after five years of litigation, the arbitrator awarded AMD more than $10 million plus prejudgment interest and a permanent, non-exclusive and royalty-free license to any Intel intellectual property embodied in AMD's own microprocessor, including the x86 instruction set. The arbitrator took notice of Intel's anti-competitive design: "In fact, it is no fantasy that Intel wanted to blunt AMD's effectiveness in the microprocessor marketplace, to effectively remove AMD as a competitor." The arbitrator further stated that Intel's conduct was "inexcusable and unworthy," the Company engaged in "corporate extortion" and employed "all of its economic force and power on a smaller competitor to have its way." Confirmation of the award was upheld by the California Supreme Court two years later. Despite this ruling, the Company continued to commit gross anti-trust violations targeting AMD and Intel's other competitors for the purpose of maintaining the illegal monopoly of its line of microprocessors.

28.    In 2003, in a major breakthrough for AMD, Microsoft announced that its Windows operating systems would now support an architecture suited to AMD's state-of-the-art 64-bit microprocessor. As noted by *Infoworld*, Intel then copied AMD's technology for its own 64-bit offerings – an event that poignantly marked AMD's technological emergence.

29.    The Defendants, however, have caused Intel to unlawfully employ a variety of financial and other exclusionary business strategies that effectively limited its customers' ability and/or incentive to deal with AMD. Indeed, according to published reports, over the past several years Intel has consistently achieved more than 90% market share as measured by revenue, while AMD's revenue share has remained at approximately 9%, with all other microprocessor manufacturers relegated to less than 1%. Since 1999, AMD's worldwide volume share has hovered at 15%, only once barely penetrating the 20% level, while Intel has captured at least 80%

of x86 microprocessor unit sales in seven of the last eight years. In the third quarter 2007, Intel accounted for 76.3% of unit sales of all x86 microprocessors.

**B.    Defendants' Actions Aimed at Original Equipment Manufacturers ("OEM")**

30.    In order to solidify its monopoly in the x86 microprocessor market, Defendants have caused Intel to use the following unlawful methods: direct payment in return for exclusivity and near-exclusivity; discriminatory rebates, discounts and subsidies conditioned on exclusivity; threats of economic retaliation against those who conduct business with Intel's competitors, or who refuse to limit their business with Intel's competitors to Intel-approved models, brands, lines and/or sectors, or who cooperate too closely with promotion of competitors' processors; and misuse of industry standards-setting processes so as to disadvantage competitors' products in the marketplace.

31.    The majority of x86 chips are sold to several OEMs, including Hewlett-Packard ("HP"), which now owns Compaq Computer; Dell, Inc.; Sony; Fujitsu; IBM, which as of May 1, 2005, sold its PC (but not server) business to Lenovo; NEC Electronics Corporation ("NEC"); Gateway/eMachines; Micron and Acer, which account for over 80% of the worldwide manufacture of personal computers.

32.    After the introduction of its Athlon microprocessor, AMD had achieved an overall Japanese unit market share of approximately 22% by the end of 2002. To reverse the erosion of its business, in 2003 Intel paid Sony millions of dollars, disguised as discounts and promotional support, in exchange for absolute microprocessor exclusivity. Sony abruptly cancelled its AMD Mobile Athlon notebook model. Soon thereafter, it cancelled plans to release AMD Athlon desktop and mobile PCs. As a result, AMD's share of Sony's business dropped from 23% in 2002 to 8% in 2003, and then to 0%, where it remains today.

33.     Similarly, AMD captured nearly 40% of NEC's microprocessor purchases for desktop and mobile PCs in the first quarter of 2002. In May 2002, however, Intel agreed to pay NEC more than 300 million yen per quarter in exchange for caps on NEC's purchases from AMD. The caps assured Intel at least 90% of NEC's business in Japan, and they established an overall worldwide quota on NEC's AMD dealings. The impact was immediate. While AMD had maintained an 84% share of NEC's Japanese consumer desktop business in the third quarter of 2002, AMD's share quickly plummeted after the payments to virtually zero in the first quarter of 2003. NEC has made clear to AMD that AMD's Japanese share must stay in the single digits pursuant to NEC's agreement with Intel.

34.     Moreover, Intel purchased an exclusive-dealing arrangement with Hitachi, Ltd. ("Hitachi"), which had been a substantial AMD customer. As a result of the agreement, though during the first part of 2002, AMD was shipping 50,000 Athlon microprocessors to Hitachi per quarter, by the middle of 2002, AMD sold no microprocessors to Hitachi at all.

35.     From 2001 to 2004, Gateway exclusively used Intel chips. In 2001 former Gateway CEO, Ted Waitt, explained to an AMD executive that Intel offered him large sums not to deal with AMD, which he could not refuse: "I have to find a way back to profitability. If by dropping you, I become profitable, that is what I will do." Shortly thereafter, Gateway stopped purchasing from AMD and issued a press release announcing its Intel exclusivity. The announcement came within weeks of similar public announcements of Intel exclusivity by both IBM and Micron.

### 1.     Product-Line, Channel or Geographic Restrictions placed on OEMs

36.     Defendants have caused Intel to employ discriminatory discounts, subsidies and payments to exclude competition from the lucrative commercial desktop sector.

37.    In 2002, when AMD set out to earn a place in HP's commercial desktop product roadmap, HP demanded a $25 million quarterly fund to compensate it for Intel's expected retaliation. Eager to break into the commercial market and to earn a place in HP's successful "Evo" product line, AMD agreed instead to provide HP with the first million microprocessors for free in an effort to overcome Intel's financial hold over HP. On the eve of the launch, HP disclosed its plan to Intel, which told HP it considered AMD's entry into HP's commercial line a "Richter 10" event. Intel immediately pressured HP into (1) withdrawing the AMD offering from its premier "Evo" brand and (2) withholding the AMD-powered computer from HP's network of independent value-added resellers, HP's principal point of access to small business users for whom the PC was designed in the first place. Intel went so far as to pressure HP's senior management to consider firing the HP executive who spearheaded the AMD commercial desktop proposal. As a result of Intel's coercion, the HP-AMD desktop offering was dead on arrival. HP ended up taking only 160,000 of the million microprocessors AMD offered for free. As of today, HP's AMD-equipped commercial desktops remain channel-restricted, and AMD's share of this business remains insignificant.

38.    After Gateway's 2004 merger with eMachines, AMD attempted to revive the relationship it had enjoyed with Gateway until 2001 but experienced extremely limited success. While Gateway built one AMD-powered desktop model at the request of Circuit City, AMD remains locked out entirely of Gateway's direct internet sales, commercial offerings and server line. According to Gateway executives, Gateway has paid a high price for even its limited AMD dealings. Pursuant to the consolidated complaint filed in the AMD Action, Gateway executives claimed that Intel has beaten them into "guacamole" in retaliation.

39.    AMD and IBM began negotiations in August 2000 over a proposed commercial PC business partnership. After seven months and with a deal nearing completion, Intel approached IBM with an incentive-based program under which Intel would become IBM's exclusive supplier for processors in commercial products. IBM accepted Intel's proposal and terminated discussions with AMD. According to IBM executive Ed Thum, in return for that exclusivity Intel paid IBM "millions of dollars in market development funds."

### 2.    Exclusionary Rebates

40.    Intel has also imposed on OEMs a system of rebates that have the practical and intended effect of creating exclusive or near-exclusive arrangements and artificially foreclosing AMD and others from competing for a share of the market.

41.    In general, the rebate schemes operate as follows: quarterly, Intel unilaterally establishes for each of its customers a target level of purchases of Intel microprocessors. If the customer achieves the target, it is entitled to a rebate on all of the quarter's purchases of all microprocessors – back to the very first one – generally in the neighborhood of 8%-10% of the price paid. Intel provides the rebate in cash at the quarter's close. OEMs operate on razor-thin margins, so qualifying for an Intel rebate frequently means the difference between reporting a profit or a loss in the coming – and closely watched – quarterly earnings.

42.    In contrast to "volume discounts" that sellers offer on a graduated and nondiscriminatory basis to reflect cost efficiencies that accrue when dealing in larger quantities, Intel's is a system of "penetration" or "loyalty" rebates designed to improperly exclude rivals from a substantial portion of the market. Intel intentionally sets a rebate trigger at a level of purchases it knows to constitute a large percentage of a customer's needs. Intel is able to develop discriminatory, customer-by-customer, unit or dollar targets that lock-in that percentage (without

12

ever referencing it), because industry publications accurately forecast and track anticipated sales and because OEM market shares – which industry publications also report weekly, monthly and quarterly – do not change significantly from quarter to quarter.

43.     Intel exacts a severe penalty from OEMs that fail to meet their targets.  For example, during the fourth quarter of 2004, AMD succeeded in getting on the HP retail roadmap for mobile computers, and its products sold very well, helping AMD capture nearly 60% of HP's U.S. retail sales for the quarter.  Intel responded by withholding HP's fourth quarter rebate check and refusing to waive HP's failure to achieve its targeted rebate goal.  Instead, Intel "allowed" HP to make up the shortfall in succeeding quarters when HP promised Intel at least 90% of HP's mainstream retail business.

44.     In the case of one European OEM, Intel imposed the additional condition that the customer purchase target volumes of specific processors, generally microprocessors against which AMD's products compete particularly well.  In the case of another, Intel offered as an inducement discounted microprocessors rather than rebates.  In the case of the European division of one United States OEM, Intel has imposed a target of between 70-90% of the customer's requirements.  Rather than qualifying the customer for a cash rebate, however, meeting the target entitles the OEM to purchase designated processors at up to 20% below "normal" cost, thereby enabling the customer to obtain favorable pricing on bundled products (*e.g.*, a Centrino-series processor and chipset) and/or to receive product offerings not available to competitors.

45.     Intel's rebate schemes are improper, unlawful, discriminatory and market-foreclosing.

3.    **Threats of Retaliation**

46.    Defendants have caused Intel to intimidate OEMs from purchasing microprocessors from anyone other than Intel with threats. For example, in late 2000, Compaq's CEO, Michael Capellas, disclosed in late 2000 that because of the volume of business he had given to AMD, Intel withheld delivery of server chips that Compaq desperately needed. Reporting that he "had a gun" to his head, Capellas informed an AMD executive that he had to stop buying AMD processors. Further, Intel has bought Dell's exclusivity with outright payments and favorable discriminatory pricing and service. In discussions about buying from AMD, Dell executives have frankly conceded that they must financially account for Intel retribution in negotiating pricing from AMD.

47.    In 2002, defendants caused Intel to threaten to discontinue providing NEC with the technological roadmap for future Intel processors if NEC did not convert its entire line of Value Star L computers to Intel microprocessors. NEC succumbed and eliminated AMD from the Value Star L series in 2002 and 2003.

48.    Intel's threats and intimidation are improper, unlawful and market-foreclosing. Furthermore, Intel's strong-arm tactics have the effect of stifling innovation by forcing upon OEMs, retailers and distributors outdated, surplus inventory left untapped by the computer market's natural demand.

C.    **Interference with AMD Product Launches**

49.    In September 2003, AMD launched its Athlon64 processor. Acer Inc. ("Acer") committed to support the AMD rollout by making a senior executive available for a videotaped endorsement and by timing the introduction of two computers, a desktop and a notebook, to coincide with AMD events planned for Cannes, San Francisco and Taiwan. Days before the

event, defendant Barrett visited Acer's Chairman, CEO and President in Taiwan, expressed to him Intel's concern and stated that Acer would suffer "severe consequences" if it publicly supported AMD's launch. The Barrett visit coincided with an unexplained delay by Intel in providing $15-20 million in market development funds owed to Acer. As a result, Acer withdrew from the launch in the U.S. and Taiwan, pulled its promotional materials, banned AMD's use of the video, and delayed the announcement of its Athlon64-powered computers. Acer's President subsequently reported that the only thing different about Intel's threats was the messenger – they were "usually done by lower ranking managers," not Intel's CEO.

50.    Intel also disrupted AMD's launch of its Opteron server chip, which was rolled out on April 22, 2003, with few in attendance and little industry support. According to the consolidated complaint filed in the AMD Action, a computer industry journal reported Intel's fingerprints: "They all [vendors] told me that prior to the launch, they received a phone call from Intel. Intel asked if they were going to the launch. If they replied yes, the Intel rep asked them if it was 'important for them to go,' or 'if they really wanted to go.' Pressing the vendors, I got the same response, 'Intel is too smart to threaten us directly, but it was quite clear from that phone call that we would be risking our various kickback money if we went.'"

**D.    Practices Directed At Distributors**

51.    Intel uses many of the same tactics it practices on OEMs to restrict distributors from carrying non-Intel processors or selling non-Intel products. For example, Intel entered into an exclusive deal with Synnex, which is one of the largest United States distributors. Given Intel's 80% plus market share, there is no pro-competitive justification for this arrangement.

52.    As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with Intel's competitors, either worldwide or in strategic sub-markets.

For example, in December 2004, Ingram Micro, Intel's biggest distributor in China, suddenly cut off talks to distribute AMD chips. A high-ranking Ingram Micro official later reported to AMD that Ingram Micro had no choice because Intel proffered loyalty rebates that were too lucrative to pass up.

53.    Other programs offered by Intel to distributors in exchange for microprocessor exclusivity include: marketing bonuses, increased rebates, credit programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance such as credits to offset inventory costs.

54.    Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota. Like the rebates offered to OEMs, the intent is to inflict economic punishment on those who do too much business with Intel's rivals. But unlike OEMs, distributors remain ignorant of the goals Intel has set for them or the precise consequences of failing to meet them. Intel does not share this information with them; they simply receive a check at the end of a quarter. As a result, every non-Intel chip they purchase is at their peril.

55.    When the above means of achieving exclusivity fail, Intel simply bribed distributors not to do business with AMD. For example, a high-ranking Tech Data executive turned down $1 million to stop doing business with AMD, which caused the Intel representatives to ask, "How much would it take?"

56.    Finally, those distributors that choose to do business with an Intel competitor have been conditioned to expect Intel retaliation. For example, when ASI began distributing AMD processors, Intel demanded that it exclude AMD personnel from its ASI Technology Shows and its General Managers' meetings. Until recently, ASI refused master distributor status from AMD, despite the financial benefits attached, because it feared that such a public alignment with

AMD would trigger Intel retaliation. When ASI finally accepted master distributor status in January 2005, Intel began reducing the level of market development funds ASI received.

57.    Avnet, Inc., one of the word's largest computer equipment distributors and an avid AMD supporter, has also received its share of Intel intimidation. Thus, Avnet cited Intel as the reason it could not distribute AMD parts to the industrial sector. And when AMD launched its Opteron server chip, Intel made clear it would make it "painful" for Avnet were it to begin distributing that chip. When Avnet did so anyway, Intel threatened to cut it off. Another distributor got even worse treatment. In retaliation for Supercom's dealings with AMD in Canada, Intel pressured Supercom's customers to switch to another distributor.

58.    Other distributors that Intel has attempted to coerce not to do business with AMD include R.I.C. in Germany, and Paradigit and Quote Components in the Netherlands.

**E.    Practices Directed At Retailers**

59.    In both the U.S. and internationally, approximately one fifth of desktop and notebook computers are purchased at retail stores. Several retailers dominate the PC market in the U.S: Best Buy and Circuit City are the largest. Other significant but smaller retailers are Walmart/Sams Club, Staples, Office Depot and Office Max.

60.    Most of the PCs sold at retail are sold during four or five "buying seasons" that correspond to events on the calendar, and retailers refresh their inventory for each of those events. A manufacturer faces a two-step process to get its product on retailers' shelves: first, it must convince one or more OEMs to build machines using its microprocessor at a suggested price point (called "getting on the roadmap"); and second, it must convince the retailer to stock and devote shelf space to these machines. Major retailers demand market development funds ("MDF") in exchange for shelf space, usually consisting of cooperative advertising support, but

more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars – *e.g.*, space in a Sunday circular, an in-store display or an internet training opportunity with the chain's sales staff.  The MDF required to secure shelf space can run as high as $25 per box depending on the computer price point and how urgently the competing chipmakers want the shelf space.

61.    Intel has historically enjoyed an advantage over competitors at retail because, using many of the strategies described above, it has gained better access to the OEM's roadmaps and has exerted pressure to keep competitors out of retailers' product plans.

62.    For example, until recently Office Depot declined to stock AMD-powered notebooks regardless of the amount of MDF AMD offered, citing its "premier" status with Intel that would be put at risk.  Fry's is Fujitsu's only retailer in the United States.  When Intel learned that Fry's was very successfully marketing Fujitsu's Athlon XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

63.    In Europe, AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales. Intel provides Media Markt between $15-20 million of MDF annually, and since 1997 Media Markt has carried Intel computers exclusively.  Intel subsidies also foreclose AMD from Aldi, a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market.

64.    In the United Kingdom, Intel has locked up substantially all of the business of Dixon Services Group ("DSG"), operator of three major chains (including Dixon and PC World) that collectively account for two thirds of the U.K. PC market.  In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10%.  Like Media Markt, DSG reports that Intel penalizes it with reduced MDF because of the business it does with AMD.

Toys 'R' Us in the U.K. is also exclusive to Intel. Time, another U.K. retailer took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models. In France, Intel has brought pressure on the largest retailers (including Conforama, Boulanger), causing them to cease dealing with AMD or to drastically reduce their AMD business.

65.    When AMD nonetheless gained some retail market share, Intel's staff was instructed "not to let this happen again." As a result, Intel instituted a rebate program similar to what it employed with OEMs, resulting in similar exclusionary effect for AMD. Under this program, Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD-based products, but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% *across all products.*

**F.    Effects of Defendants' Misconduct**

66.    Defendants' unlawful conduct has already caused and will continue to cause substantial harm to Intel and its shareholders. The Company has already paid over $10 million in damages to AMD stemming from its alleged breach of the Intel/AMD collaboration Agreement and faces potential liability from several ongoing regulatory investigations, scores of private lawsuits in the United States and Japan, and a private lawsuit brought by AMD in the United States District Court for the District of Delaware, which is scheduled for trial in 2009.

67.    On March 8, 2005, the JFTC issued a recommendation ("Recommendation") to Japan-based Intel Kabushiki Kaisha ("IJKK"), stating, in part, the following:

The Facts-Findings in the Recommendation

IJKK, since May 2002, has made the five major Japanese OEMs[1] refrain from adopting competitors' CPUs[2] for all or most of the PCs manufactured and sold by them or all of the PCs that belong to specific groups of PCs referred to as 'series', by making commitments to provide the five OEMs with rebates and/or certain funds referred as 'MDF' (Market Development Fund) in order to maximize their MSS (MSS is the ratio of the CPUs manufactured and sold by Intel ('Intel's CPUs') in the volume of CPUs to be incorporated into the PCs which are manufactured and sold by an OEM), respectively, on condition that

(a)    the Japanese OEMs make MSS at 100% and refrain from adopting competitors' CPUs.

(b)    the Japanese OEMs make MSS at 90%, and put the ratio of competitors' CPUs in the volume of CPUs to be incorporated into the PCs manufactured and sold by them down to 10%; or

(c)    the Japanese OEMs refrain from adopting competitors' CPUs to be incorporated into PCs in more than one series with comparatively large amount of production volume to others.

Based on the facts mentioned above, the ratio of the sales volume by AMD Japan and Transmeta USA among Total Domestic CPU Sales Volume decreased from approximately 24% in 2002 to approximately 11% in 2003.

By means of such conducts, IJKK has substantially restrained the competition in the market of CPUs sold to the Japanese OEMs, by acting to exclude its competitors' business activities related to the sales of CPUs to the five OEMs.

Summary of Measures Recommended

(1)    IJKK, when selling Intel's CPUs to the Japanese OEMs, shall terminate such conducts which have been engaged by IJKK since May 2002 as; with respect to the CPUs incorporated into the PCs manufactured and sold by the Japanese OEMs, by making commitments to provide the Japanese OEMs with the rebates and/or funds on condition that, as mentioned above, the Japanese OEMs refrain from adopting competitors' CPUs to be incorporated into all or most of the PCs which are manufactured and sold by them.

---

[1]  Japanese manufacturers of PCs with head offices located in Japan.

[2]  x86 series central processing units.

(2)  IJKK shall notify the following matters to all the Japanese OEMs with which IJKK deals, and shall also make them known to its employees thoroughly.

    a)  Measures taken by IJKK based on (1) above

    b)  IJKK, when providing the Japanese OEMs with such rebates and/or funds, has no intention to set condition which lead to exclude competitors' CPUs out of the PCs which are manufactured and sold by the Japanese OEMs

    c)  IJKK has already terminated the conduct to make a Japanese OEM not adopt competitors' CPUs in more than one groups of PCs, each of which has comparatively large amount of production volume to others, thereby making all the PCs in those groups of PCs at that OEM incorporate Intel's CPUs, by making a commitment to provide it with the rebates and/or funds on condition that the Japanese OEM change to Intel's CPUs competitors' CPUs previously incorporated into the PCs in those groups of PCs, and that it keep using Intel's CPUs in all the PCs in those groups of PCs.

(3)  IJKK, from now on, shall not exclude the business activities of the competitors for the sales of CPUs by employing following conducts:

    a)  The conduct to restrict the ratio in the volume of competitors' CPUs to be incorporated into the PCs manufactured and sold by a Japanese OEM at 10 percent or less, by making a commitment to provide the Japanese OEM with the rebates and/or funds on condition that it make MSS at 90% or more and maintain MSS at such level

    b)  The conduct to, without justification, make a Japanese OEM not adopt competitors' CPUs to be incorporated into PCs in more than one groups of PCs, each of which has comparatively large amount of production volume to others, thereby making all the PCs in those groups of PCs at that OEM incorporate Intel's CPUs, by making a commitment to provide the Japanese OEM with the rebates and/or funds on condition that it change to Intel's CPUs competitors' CPUs previously incorporated into the PCs in those groups of PCs, and that it keep using Intel's CPUs in all the PCs in those groups of PCs.

(4)     IJKK shall take measures to operate (i) Antimonopoly training for officers of sales department and their staffs [sic] engaged in promoting and selling CPUs, and (ii) periodical audits by legal section, thereby ensuring the conduct mentioned above in (3) shall not be caused hereafter.

68.     In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to, among other companies, Sony, NEC and Hitachi.

69.     On July 27, 2007, the European Commission issued a press release entitled "Competition: Commission Confirms Sending of Statement of Objections to Intel." The press release stated, in relevant part:

> The European Commission can confirm that it has sent a Statement of Objections (SO) to Intel on 26th July 2007. The SO outlines the Commission's preliminary view that Intel has infringed the EC Treaty rules on abuse of a dominant position (Article 82) with the aim of excluding its main rival, AMD, from the x86 Computer Processing Unites (CPU) market.
>
> In the SO, the Commission outlines its preliminary conclusion that Intel has engaged in three types of abuse of a dominant market position. First, Intel has provided substantial rebates to various Original Equipment Manufacturers (OEMs) conditional on them obtaining all or the great majority of their CPU requirements from Intel. Secondly, in a number of instances, Intel made payments in order to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based CPU. Thirdly, in the context of bids against AMD-based products for strategic customers in the server segment of the market, Intel has offered CPUs on average below cost.
>
> These three types of conduct are aimed at excluding AMD, Intel's main rival, from the market. Each of them is provisionally considered to constitute an abuse of a dominant position in its own right. However, the Commission also considers at this stage of its analysis that the three types of conduct reinforce each other and are part of a single overall anti-competitive strategy.

70.    In addition, on January 11, 2008, *Business Week* reported that New York State Attorney General Andrew Cuomo served Intel and AMD with demands for information "to show that Intel stifled competition and hurt consumers by illegally coercing computer makers to use its chips.  Intel did that through rebates, punitive pricing, and exclusive contracts that shut out AMD..."  The article further reported that "The Federal Trade Commission is also investigating allegations of anticompetitive behavior by Intel..."

71.    As reported in *The Wall Street Journal*, also on January 11, 2008, "Three other government bodies have sided against Intel after studying the situation.  The European Commission issued a 'statement of objections' against the company in July, a preliminary ruling that can lead to fines or other penalties...  In September, authorities in South Korea accused Intel of violating the country's antitrust laws.  Japan's Fair Trade Commission regulator issued a cease-and-desist order against Intel in March 2005 over tactics that included using rebates and marketing funds to induce Japanese computer makers to buy microprocessors from Intel."

72.    On February 12, 2008, *Bloomberg.com* reported that the European Union regulators, in furtherance of their antitrust probe, raided Intel's offices in Munich and computer retailers in the United Kingdom and Germany.  Specifically, the officials inspected the offices of Media Markt, DSG International Plc in the United Kingdom and France's PPR SA.  The raids targeted "Intel's possible links with computer retailers."  The commission stated that "it has reason to believe that the companies may have violated EU rules on restrictive business practices, abuse of a dominant market position, or both."  Commenting on the investigation, PPR SA representative stated that the company and its companies are concerned about this probe because "it markets products by Intel."

73.     Furthermore, on February 13, 2008, commenting on the European regulators'
raids of Intel's German offices, *The Wall Street Journal* reported that "It is 'unusual' for the
commission to raid companies halfway into its antitrust investigation, one Brussels-based lawyer
said.  It could mean that the companies have not been straight with the information they have
supplied to the commission, or that some new infringement has come to light, he said."

## DERIVATIVE ALLEGATIONS

74.     Plaintiff brings this complaint derivatively in the right and for the benefit of
Intel to redress injuries suffered and to be suffered by Intel as a direct result of the violations of
fiduciary and other common law duties by the defendants to Intel and its public shareholders.
This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

75.     Plaintiff will adequately and fairly represent the interests of Intel and its public
shareholders in enforcing and prosecuting their rights.

76.     Plaintiff has not made any demand on the Board of Directors of Intel to
institute this action because such demand would be a futile and useless act for the following
reasons:

(i)     The Intel Board has proven itself to be unwilling to bring remedial action
against wrongdoers that have caused the Company substantial harm
regarding conduct of which the Board was aware.  Intel was forced to pay
a fine of over $10 million to settle litigation concerning its violations of
the Agreement.  The Intel Board made no effort to recover any of these
damages from the known wrongdoers in the past, nor has it acted in any
way to curtail the Company's ongoing anti-trust violations.

(ii)    There was a sustained and systematic failure of the Board to exercise oversight, in that the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses. The directors' decision to not act was not made in good faith and was contrary to the best interests of the Company;

(iii)   The Board has made no effort to recover any portion of the fines levied against it from the principal wrongdoers;

(iv)    The acts complained of herein constitute illegal acts and violations of fiduciary and common law duties owed by Intel's Board and these acts are incapable of ratification;

(v)     The defendants intentionally breached and/or recklessly and/or negligently disregarded their fiduciary duties, choosing not to address the matters raised by the outcome of litigation stemming from Intel's alleged violations of the Agreement. Although the Company was already the subject of government scrutiny and civil complaints, the defendants allowed the improper conduct to continue and failed to take appropriate remedial actions;

(vi)    The Board has failed to commence any action against the principal wrongdoers despite the lengthy passage of time since their criminal acts were revealed;

(vii)   The known principal wrongdoers are in a position to, and do, dominate and control the Intel Board of Directors, paying them high annual and

monthly fees to assure their compliance. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(viii)   The acts complained of herein are illegal and unreasonable and thus are incapable of ratification;

(ix)   In order to bring this action for breach of fiduciary and common law duties, the members of the Intel Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, with whom they are well acquainted and with whom they have entangling alliances, interests, and dependencies, which they would not do. They therefore would not be able to vigorously prosecute any such actions; and

(x)   The members of the Intel Board of Directors, including each of the defendants herein, receive substantial benefits, and other emoluments by virtue of their membership on the Board and their control of Intel. Bringing an action or even adequately investigating other directors, who have the power to terminate a director's employment, would not likely occur. The defendants are incapable of exercising independent objective judgment in deciding whether to bring this action.

## COUNT I

### (Breach of Fiduciary Duties)

77.   Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

78.    Each defendant owed Intel and its public shareholders the highest duties of loyalty, honesty, and care in conducting their affairs.

79.    At a minimum, to discharge these duties, each defendant should have exercised reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of Intel.  By virtue of these obligations, each defendant was required, inter alia:

a.    to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of Intel;

b.    to be and remain informed as to how Intel was operating and, upon receiving notice or information of an imprudent, questionable, or unlawful decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and

c.    to conduct the affairs of Intel in a lawful manner and in compliance with government rules and regulations.

80.    The defendants knowingly, intentionally, recklessly or negligently breached their fiduciary duties and, thereby, caused the Company to commit illegal acts, waste its assets, and impair its reputation and credibility for no legitimate business purpose, as a result of which Intel has been and continues to be substantially damaged.

81.    Accordingly, plaintiff seeks on behalf of Intel monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT II

### (Indemnification)

82.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

83.     As alleged herein, the defendants, acting as officers and/or directors of Intel and, therefore, as its agents, breached their fiduciary duties to Intel and its public shareholders.

84.     Intel has suffered significant and substantial injury as a direct result of the defendants' knowing, intentional, or reckless breaches of their fiduciary duties as alleged herein. Plaintiff, on behalf of the Company, seeks relief from the defendants on the theory of indemnity for all such damages.

**WHEREFORE**, plaintiff prays for judgment as follows:

A.     Declaring that the defendants have breached their fiduciary duties as alleged herein;

B.     Directing defendants, jointly and severally, to account for all losses and/or damages sustained by Intel by reason of the acts and omissions complained of herein and remit those sums to Intel;

C.     Requiring defendants to remit to Intel all of their salaries, fees, bonuses, stock awards, and other compensation received for the periods when they breached their duties;

D.     Ordering that defendants and those under their supervision and control refrain from further violations as are alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

E.     Awarding pre-judgment and post-judgment interest as allowed by law;

F.     Awarding plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

G.    Granting such other and further relief as this Court may deem just and proper.

DATED:   February 15, 2008

By: _____

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky (DSBA #3147)
Brian D. Long  (DSBA #4347)
919 N. Market Street, Suite 980
Wilmington, DE 19801
(302) 295-5310

**STULL, STULL & BRODY**
Jules Brody
6 East 45th Street
New York, New York 10017
(212) 687-7230

*Attorneys for Plaintiff*

29

# Exhibit A

## VERIFICATION

I, Evan Tobias, declare under penalty of perjury as follows: I have read a draft of the annexed Verified Shareholder Derivative Complaint, know the contents thereof and the same are true and accurate to the best of my personal knowledge, information and belief, based upon the investigation of my counsel.

Executed on: February 15, 2008

EVAN TOBIAS

≈JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
EVAN TOBIAS, DERIVATIVELY ON BEHALF OF INTEL CORPORATION

**DEFENDANTS**
CRAIG R. BARRETT, ET AL.
SANTA CLARA, CA

**(b)** County of Residence of First Listed Plaintiff KINGS COUNTY, NY
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
BRIAN D. LONG - RIGRODSKY & LONG, P.A.
919 N. MARKET ST. SUITE 980 WILM., DE 19801

Attorneys (If Known)

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN  (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 USC 1332

Brief description of cause: SHAREHOLDER DERIVATIVE ACTION FOR BREACH OF FIDUCIARY DUTY

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE UNASSIGNED   DOCKET NUMBER 1:08-CV-000 93 UNA

DATE 2-15-08

SIGNATURE OF ATTORNEY OF RECORD  Brian D. Long  (#4347)

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____